IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GARY SMITH,

    Petitioner,

  v.

A.P. KANE, Warden,
JAMES DAVIS, Chairman,
Board of Parole Hearings,

    Respondents.
                                 /

No. C 06-1830 CW (pr)

ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS

Petitioner Gary Smith, proceeding <u>pro se</u>, has filed a petition for a writ of habeas corpus pursuant to title 28 U.S.C. § 2254, challenging as a violation of his constitutional rights the denial of parole by the California Board of Parole Hearings (Board).[1]

Respondents have filed an answer.[2] Petitioner has filed a

---

[1] The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings. Cal. Penal Code § 5075(a).

[2] The State claims that under Rule 2(a) of the Rules Governing Habeas Corpus Cases Under Section § 2254, the proper respondent is A.P. Kane, the warden at the Correctional Training Facility where Petitioner is incarcerated. (Answer at note 2, citing <u>Stanley v. California Supreme Court</u>, 21 F.3d 359, 360 (9th Cir. 1994) (holding that the warden where petitioner is incarcerated is the proper respondent).) In its October 26, 2006 Order, the Court noted that it was the State's practice in prisoner petitions challenging parole decisions to designate James Davis, the Chairman of the

traverse. Having considered all of the papers filed by the parties, the Court DENIES the petition.

## BACKGROUND

At Petitioner's initial parole suitability hearing on July 31, 2003, the Board considered the following information, derived from the Los Angeles County Probation Officer's Report, about the murder of Mauritious Shaw:

> On May 10, 1985 at about 9:00 p.m., a car pulled up in front of a liquor store located on 106th Street and Normandie Avenue in Los Angeles where . . . Shaw, accompanied by two of his relatives, was walking out. Smith got out of the car holding a handgun, spoke to Shaw, and then fired about five shots at him hitting him several times. Smith left the scene. Shaw was taken to the hospital where he died shortly thereafter.
>
> Smith denied any involvement in this case. The Los Angeles Sheriff's Department investigating -- investigating officer, however, describes Smith as cold-blooded killer who was dealing in rock cocaine, and believed that the murder was an act of revenge against Shaw who had ripped Smith off. The probation officer's report, in his evaluation of the report, page nine, stated that Smith sought out Shaw, burglarized [sic] his murderous intentions, and then shot Shaw in a public place in view of witnesses.
>
> Smith, known in the community as a rock cocaine dealer, felt that he had been wronged, and used this act not only as a means of seeking revenge, but also as a warning (inaudible) the community that he would not tolerate any impertinence in his illegal activities.

---

Board of Parole Hearings as the proper Respondent. Accordingly, the Court substituted him as Respondent. The Court directs the Clerk of the Court to include Kane and Davis as Respondents in this action.

2

(Resp't Ex. 2, Initial Parole Suitability Hearing Transcript at 9-10.)

Petitioner was sentenced to twenty-seven years to life in prison with the possibility of parole for his 1986 conviction for one count of first degree murder, plus a firearm enhancement. (Resp't Ex. 1, Abstract of Judgment at 1.) He started serving his sentence on September 10, 1986, and his minimum eligible parole date was May 28, 2004. (Resp't Ex. 2 at 1.)

Since his incarceration, Petitioner has had a primarily positive record. His only disciplinary infraction was a rules violation report (CDC-115) on November 16, 1995 for a Division "F" offense for disrupting and delaying institutional count. (Id. at 31.) He received five disciplinary memos (CDC-128) while incarcerated, including for disobeying orders, making unauthorized telephone calls, refusing to perform duties, and displaying offensive materials. (Id. at 49-50.) He completed a personal growth seminar with a Catholic chaplain in June, 1995, the Life Skills Group program on July 1, 1998, and an Anger Management course on February 20, 2002. (Id. at 30.)

While incarcerated, Petitioner also completed various vocational courses in air conditioning, refrigeration and welding. (Id. at 26-27.) Petitioner worked in culinary maintenance from 1997 to 1998 and received above average and exceptional ratings in that assignment. (Id. at 27.) At the time of the initial parole suitability hearing, Petitioner was working as a warehouse clerk. (Id. at 29.)

Petitioner was represented by counsel at his initial parole

suitability hearing.  (Id. at 2.)  In addition to Petitioner's prison record, the Board considered his prior criminal record. Petitioner had been arrested multiple times for grand theft, but he was not convicted of any charges stemming from these arrests.  (Id. at 18-19, 49.)  He had also been arrested for possession and sales of a controlled substance, but the charge was dismissed for lack of evidence.  (Id. at 19.)  Prior to his 1986 conviction, Petitioner had graduated from high school and attended a junior college.  (Id. at 21.)  The Board noted that he "subsequently became involved in the selling of drugs (inaudible) results of peer pressure and of his materialistic goals."  (Id.)

The Board considered a report by Petitioner's correctional counselor.  Upon considering Petitioner's commitment offense, prior record and positive prison adjustment over time, the counselor found that Petitioner would pose a low degree of threat to society only if he remained drug and alcohol-free and if he stayed away from the community drug culture.  (Id. at 33.)

Petitioner's 2003 mental health evaluation stated that he had "genuinely reformed himself over the years with the help of vocational training, as well as his religious commitment over the last five years" and that "his violence potential is estimated to be no higher than the average citizen in the community."  (Resp't Ex. 5, Psychological Evaluation at 4.)  The evaluation took into account Petitioner's lack of any prior arrests for violent behavior, and the lack of evidence of any violent behavior since he committed the commitment offense.  (Id.)

The Board also considered a letter from Petitioner's mother,

4

Anna Smith, who said that he would be welcome to stay with her in Los Angeles if he was granted parole.  The letter stated, in part, "I intend to provide any housing and or transportation needed by Gary to assist him in getting on his feet."  (Resp't Ex. 2 at 37.)  Further, the Board noted that Petitioner's two sisters, Peggy Webb and Sharon Pointer, also offered Petitioner a place to reside if released on parole.  (Id. at 36-37.)  Petitioner's father, Ernest Smith, Sr., offered to assist Petitioner financially because Petitioner did not have any job offers in the Los Angeles area.  (Id. at 37.)

Finally, the Board considered the Los Angeles County District Attorney's Office opposition to Petitioner's parole.  (Id. at 41-42.)  The Deputy District Attorney pointed out that Petitioner denied under oath any involvement in Shaw's murder:

> It is bad enough when you take someone's life in cold blood, and then to try to get away with it by deceiving and misleading the jury and trying to walk out the door free (inaudible).  So, I think it's a double (inaudible) that he is not only taking a human life and all the tragedy that goes with that and the manner that it occurred, but also trying to get away with it and beating the system. . . .

(Id. at 41.)

After a brief deliberation, the Board concluded that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released.  (Id. at 48.)  The Board issued a four-year denial of parole.  (Id. at 51.)  In support of its decision, the Board stated that the commitment offense "was carried out in an especially cruel and callous manner" and noted that the motive for the crime "was

5

inexplicable or very trivial in relationship to the offense." (Id. at 49.) Further, the Board found that Petitioner had a previous record which "escalated to the pattern of being a drug dealer" and that he had not sufficiently "participated in beneficial self-help and therapy." (Id.) Although the Board did commend Petitioner for having received only one disciplinary infraction, for learning various vocational trades, and for participating in self-help programming, the Board found Petitioner's gains were recent and that he must demonstrate "the ability to maintain those gains for an extended period of time." (Id. at 50-51.) The Board also found that it was not reasonable to expect that parole would be granted at a hearing during the next four years. (Id. at 51.) In the interim, the Board directed Petitioner to remain disciplinary-free and to continue to "upgrade vocationally, educationally, as well as . . . to participate in beneficial self-help programming." (Id. at 52.)

On December 21, 2004, Petitioner filed in Los Angeles County Superior Court a petition for a writ of habeas corpus challenging the Board's decision. (Resp't Ex. 4, Dec. 21, 2004 Los Angeles County Superior Court Order at 1.) In a reasoned opinion, the court denied the petition, finding that some evidence supported the Board's denial of parole. (Id.) However, it held that no evidence supported the Board's findings that Petitioner is unsuitable for parole because of his prior criminal history, his unstable social history, or his failure to demonstrate a positive change in his conduct. (Id. at 1-2.) The court found that the Board's denial of parole was justified in that the "commitment offense was especially

cruel in that it was carried out in a manner which demonstrated an exceptionally insensitive disregard for human suffering, was dispassionate and calculated, and that the motive was inexplicable or very trivial," and that Petitioner "failed to participate sufficiently in beneficial self-help programming and still needs therapy in order to understand the factors which lead him into a lifestyle of drug dealing and murder." (Id. at 2.) Further, the court rejected Petitioner's argument that the Board did not properly consider the mandates of California Penal Code § 3041. (Id.) The court found that the proportionality requirement of § 3041(a) does not apply until Petitioner is found suitable for parole. (Id. at 2-3.) The court noted that the Board acknowledged Petitioner's institutional gains but found that the positive aspects did not outweigh the indications of unsuitability and that Petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. (Id. at 3.) Therefore, the court found the Board did not abuse its discretion by denying Petitioner's parole. (Id.)

After the California Court of Appeal and California Supreme Court issued summary denials, Petitioner brought a federal habeas petition in this Court.

LEGAL STANDARD

Because this case involves a federal habeas corpus challenge to a state parole eligibility decision, the applicable standard is contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002).

7

Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1).

Respondents concede that Petitioner has exhausted his state remedies by filing the petition for a writ of habeas corpus in the California Supreme Court. Where, as here, the highest state court to reach the merits issued a summary opinion which does not explain the rationale of its decision, federal court review under § 2254(d) is of the last state court opinion to reach the merits. Bains v. Cambra, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000). In this case, the last state court opinion to address the merits of Petitioner's claim is the opinion of the Los Angeles County Superior Court.

DISCUSSION

I. Due Process Claim

Petitioner asserts that his due process rights were violated by the Board's decision to deny parole because that decision was not supported by "some evidence." (Pet. at 4(a).) Petitioner's claim fails.

Because California prisoners have a constitutionally

8

protected liberty interest in release on parole, they cannot be denied a parole date without the procedural protections necessary to satisfy due process. McQuillion, 306 F.3d at 902. A parole board's decision must be supported by "some evidence" to satisfy the requirements of due process. Superintendent v. Hill, 472 U.S. 445, 455 (1985); McQuillion, 306 F.3d at 904; Morales v. California Dep't of Corrections, 16 F.3d 1001, 1005 (9th Cir. 1994), rev'd on other grounds, 514 U.S. 499 (1995). The evidence underlying the board's decision must have some indicia of reliability. McQuillion, 306 F.3d at 904; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987).

In denying Petitioner's request for parole, the Board first opined that the commitment offense demonstrated that Petitioner displayed an "exceptionally insensitive disregard for human suffering." (Resp't Ex. 2 at 48.) The Board noted that Petitioner murdered Shaw in a dispassionate and calculated manner and that the motive for the crime was trivial in relationship to the offense. The Board stated:

> The prisoner pulled up in a car, and the victim -- spoke to the victim while holding a handgun, and then fired some five shots at the victim striking him numerous times. The prisoner left the scene . . . . The victim had taken -- ripped off the prisoner of his illicit drug business (inaudible) cocaine. These conclusions are drawn from the Statement of Facts wherein the prisoner caused the demise of Mr. Shaw as he shot him some multiple times (inaudible).

(Id. at 48-49.)

The Board also cited Petitioner's escalating pattern of arrests prior to his conviction for the commitment offense. (Id. at 49.) However, the Board acknowledged that Petitioner was not

convicted of any of those previous arrests. (Id.)

Additionally, the Board cited Petitioner's unstable social history and need for more self-help programming before release. (Id. at 49.) The Board noted that Petitioner had failed to demonstrate evidence of a positive change while incarcerated because of his six instances of misconduct, including one CDC-115 and five CDC-128s. (Id.) The Board was pleased that Petitioner completed various vocational programs and participated in personal self-help programming. (Id.) However, the Board noted that the positive aspects of Petitioner's profile were relatively recent and stressed the importance of continuing to "participate in beneficial self-help programming so he can better understand . . . the drug lifestyle that caused [him] to take another human being's life." (Id. at 50-52.)

Petitioner argues that the Board's finding that the nature of his offense outweighed the positive aspects of his profile was not supported by the evidence. He relies on Biggs v. Terhune, 334 F.3d 910, 915-16 (9th Cir. 2003).

In Biggs, the Ninth Circuit found that parole denial based solely on the gravity of the commitment offense can initially satisfy due process requirements, and that the "some evidence" standard could be satisfied by the Board's consideration of the gravity of the offense. However, in dicta, the Biggs court held that courts may also consider the parole board's decision-making process over time: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered . . . . A continued reliance in the future on

an unchanging factor . . . runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17.

Nevertheless, the Board's decision at issue here does not constitute a due process violation. Although the Ninth Circuit has stated that, over time, continuous denial of parole based on the commitment offense could result in denial of due process, see id. at 916-17, it has not specified the number of denials or the length of time served beyond the minimum sentence that would constitute a due process violation. Petitioner has only been denied parole by the Board once; this was his initial parole suitability hearing. District courts which have granted habeas petitions challenging the Board's decisions addressed situations involving more denials of parole than in the instant case. See e.g., Irons v. Carey, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005) (finding due process violation in denial of parole at fifth parole suitability hearing after petitioner had served sixteen years of a seventeen-years-to-life sentence for second degree murder with a two-year enhancement for use of firearm where all factors indicated suitability for parole), rev'd, 505 F.3d 846 (9th Cir. 2007) (given the egregiousness of the commitment offense, due process not violated when Board deemed petitioner unsuitable for parole prior to expiration of his minimum term); Johnson v. Finn, 2006 WL 195159, *12 (E.D. Cal. 2006) (finding due process violation in denial of parole at twelfth parole suitability hearing after petitioner had served twenty-four years of sentence of life with the possibility of parole for first degree murder

where all factors indicated suitability for parole). The Ninth Circuit has recently reversed a district court's habeas denial upon finding a due process violation based on the governor's reliance on the "unchanging factor" of the gravity of the commitment offense to reverse the Board's grant of parole. See Hayward v. Marshall, No. 06-55392, slip op. 35, 56 (9th Cir. Jan. 3, 2008). The Board had granted parole at the petitioner's eleventh parole suitability hearing after he had served twenty-seven years of a fifteen-years-to-life sentence for second degree murder. Id. The Ninth Circuit found that the governor's decision was not supported by any evidence that the petitioner's release would threaten public safety. Id.

The Board here relied on more than the single "unchanging factor" of Petitioner's commitment offense in denying him parole. Although the cruel nature of Petitioner's commitment offense weighed heavily in the Board's determination, his "history of unstable and tumultuous relationships with others" also counseled against parole. (Resp't Ex. 2 at 49.) The motive for the crime, Petitioner's participation in drug dealing, was trivial. (Id.) His misconduct while incarcerated also failed to demonstrate evidence of positive change. (Id.) Petitioner's relatively recent participation in beneficial self-help programming led the Board to conclude that Petitioner "must demonstrate the ability to maintain those gains for an extended period of time." (Id. at 50.) The conclusion that he needed more exposure to self-help programming contributes to "some evidence" for denying him parole.

The Ninth Circuit's evolving guidance in Biggs, Sass, Irons, and Hayward suggests that the Board can continue to evaluate static factors, including the nature of the commitment offense and pre-conviction criminality, in deciding whether to grant parole. See Sass, 461 F.3d at 1129. The weight to be attributed to those immutable events, however, should decrease as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior. See Biggs, 334 F.3d at 916-17; Irons, 505 F.3d at 851. Should Petitioner continue to follow the Board's advice by attending self-help programming and maintaining a positive disciplinary record, continued parole denials based on Petitioner's commitment offense alone could eventually give rise to a due process violation. See Biggs, 334 F.3d at 916-17.

The Los Angeles County Superior Court concluded that the record contained "some evidence" to support the Board's finding that Petitioner is unsuitable for parole. (Resp't Ex. 4, Los Angeles County Superior Court Order at 1.) The California state courts' denial of Petitioner's claim was not contrary to, or an unreasonable application of, controlling federal law, nor based on an unreasonable determination of facts. See 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to relief, and his due process claim is DENIED.

II. Apprendi Claim

Petitioner further asserts that his due process rights were violated by the Board's decision to deny parole because that decision was based on factors not specifically found by a jury. (Pet. at 6(a).) Petitioner's claim is without merit.

13

The United States Supreme Court has ruled that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 488-90 (2000). For example, an allegation that a criminal defendant personally used a firearm in the commission of the underlying offense may not be adjudicated by a judge alone where doing so could alter the maximum penalty of the crime committed. Dillard v. Roe, 244 F.3d 758, 773 (9th Cir. 2001) (additional fact found by trial judge was an element that transformed the offense for which petitioner was charged and convicted into a different, more serious offense that exposed him to greater and additional punishment).

However, Apprendi does not apply here because the statutory maximum for first degree murder in California is an indeterminate life sentence. See Cal. Penal Code §§ 182, 190(a). Accordingly, because the decision to deny parole neither increases the maximum penalty for first degree murder nor Petitioner's sentence, his Apprendi claim is DENIED.

III. State Law Claims

Finally, Petitioner alleges that he is entitled to a set parole date under the Board's regulations and under the California Penal Code requirement that the Board set uniform terms. However, Petitioner supports his argument only with state statutes and case law. "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62,

14

67 (1991). Federal habeas relief is not available for violations of state law or for alleged errors in the interpretation or application of state law. Id. Accordingly, Petitioner's state law claims are DISMISSED.

CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.[3]

The Clerk of the Court shall enter judgment, terminate all pending motions, and close the file.

IT IS SO ORDERED.

Dated: 1/23/08

CLAUDIA WILKEN
United States District Judge

---

[3] On April 18, 2007, Petitioner filed a motion for the Court to take judicial notice of Cunningham v. California, 127 S. Ct. 856 (2007), holding that California's determinate sentencing law violated the Sixth Amendment because it allowed the sentencing court to impose an elevated sentence based on aggravating facts that it found to exist by a preponderance of the evidence. Id. at 860, 870-71. Petitioner claims that "the same Sixth Amendment principles applies [sic] to indeterminate sentenced prisoners where aggravation such as special circumstances was assessed to the offense without any facts established by a jury." This claim is unexhausted. Even if his claim was exhausted, it lacks merit because Cunningham does not apply retroactively on habeas review to Petitioner's 1986 conviction and sentence at issue here. Unlike the instant case, Cunningham was a decision on direct review. Because Cunningham relied heavily on the new procedural rule announced in Blakely v. Washington, 542 U.S. 298 (2004), several district courts in this circuit have held that Cunningham does not apply retroactively to convictions that were final prior to its publication. Rosales v. Horel, 2007 WL 1852186, at *2-3 (S.D. Cal.); see also Fennen v. Nakayema, 2007 WL 1742339, at *6 (E.D. Cal.) (if Blakely is not retroactive on collateral review, then there is no reason to find Cunningham would be retroactively applied to cases which have already become final). Therefore, Petitioner's motion (docket no. 6) is DENIED.

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY SMITH,<br><br>    Plaintiff,<br><br>v.<br><br>A.P. KANE et al,<br><br>    Defendant. | Case Number: CV06-01830 CW<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on January 23, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Gary Smith D-39109
P.O. Box 689 (Z)246up
Soledad, CA 93960-0689

Jessica N. Blonien
Attorney General's Office
for the State of California
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550

Dated: January 23, 2008

                                          Richard W. Wieking, Clerk
                                        By: Sheilah Cahill, Deputy Clerk